UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN JOHNSON,

Plaintiff,

-against-

GLENN S. GOORD, et al.,

Defendants.

04 Civ. 5919 (RJH)

**MEMORANDUM OPINION AND ORDER**

Plaintiff John Johnson brings this § 1983 action alleging that defendants violated his procedural due process rights in conducting and reviewing a disciplinary hearing for possession of contraband in prison. Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing plaintiff's complaint. In a Report and Recommendation ("Report") dated October 19, 2006, Magistrate Judge Gabriel W. Gorenstein recommended that defendants' motion be granted in its entirety. *See Johnson v. Goord*, No. 04 Civ. 5919 (RJH)(GWG), 2006 U.S. Dist. LEXIS 76075, 2006 WL 2990029 (S.D.N.Y. Oct. 19, 2006). Plaintiff sought and obtained an extension of time in which to file his objections, and submitted them on December 14, 2006. Defendants sought and obtained an extension of time in which to file a response to plaintiff's objections, and submitted the response on February 2, 2006. The facts underlying plaintiff's action and relevant to defendants' motion are set forth in detail in Judge Gorenstein's thorough report, familiarity with which is presumed, and which is attached herewith for ease of reference.

**STANDARD OF REVIEW**

A district court may designate a magistrate to hear and determine certain motions and to submit to the court proposed findings of fact and a recommendation as to the disposition of the motion. *See* 28 U.S.C. § 636(b)(1). The district court adopts a magistrate judge's report and recommendation when no clear error appears on the face of the record. *See Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985). However, the court is required to make a de novo determination of those portions of a report to which objection is made, 28 U.S.C. § 636(b)(1)(C), by reviewing "the Report, the record, applicable legal authorities, along with Plaintiff's and Defendant's objections and replies." *Badhan v. Lab. Corp. of Am.*, 234 F. Supp. 2d 313, 316 (S.D.N.Y. 2002). The court may then accept, reject, or modify in whole or in part recommendations of the magistrate judge. *See Nelson*, 618 F. Supp. at 1189. If, however, the party "makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Sanchez v. Dankert*, No. 03 Civ. 2276 (LTS), 2004 U.S. Dist. LEXIS 3716, 2004 WL 439502, at *1 (S.D.N.Y. Mar. 9, 2004); *accord Johnson v. City Univ. of New York*, No. 00 CV 4964 (WK), 2003 U.S. Dist. LEXIS 10615, 2003 WL 21435469, at *1 (S.D.N.Y. June 19, 2003); *Greene v. WCI Holdings Corp.*, 956 F. Supp. 509, 513 (S.D.N.Y. 1997). "If no objections are filed, or where objections are merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition, reviewing courts should review a report and recommendation for clear error." *Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006) (internal quotation marks and citations omitted).

Plaintiff has submitted eighty-two pages of objections, requiring a good deal of parsing and interpretation. Plaintiff's arguments are repeated numerous times throughout the objections, and are repetitive of the original arguments made in his opposition brief and sur-reply filed before Judge Gorenstein, with one additional argument not addressed in the Report. With the exception of that additional argument, the Court finds that the objections are merely a rehashing of the arguments addressed by Judge Gorenstein. The Court therefore need only review Judge Gorenstein's Report for clear error, while addressing plaintiff's additional argument de novo. Nonetheless, the Court will still respond directly to plaintiff's voluminous objections to Judge Gorenstein's Report.

## DISCUSSION

In his objections, plaintiff argues: (1) that the inconsistency between his copy and the official copy of the misbehavior report, with the latter containing an additional sentence, denied him due process; (2) that there was insufficient evidence showing that the contraband belonged to him because other inmates had access to the pilaster in which it was found; (3) that defendants are not entitled to qualified immunity because the law governing the sufficiency of the evidence was clearly established; and (4) that the alleged failure of the corrections officer to follow state chain-of-custody regulations violated his due process rights. Additionally, plaintiff argues that defendant Selsky's review of his disciplinary ruling using a poor audio recording of the hearing violates his procedural due process rights.

### I. Sufficiency of the Misbehavior Report

Plaintiff repeatedly contends that the late addition of a sentence to his misbehavior report stating that the contraband had tested positive as being marijuana was

a due process violation.  (*See, e.g.*, Objections 3–5, 8–11, 20–24.)  In doing so, he incorrectly focuses on the discrepancy between the official copy of the misbehavior report and the one he was given.  Instead, the due process analysis concerning notice properly focuses on whether the inmate was adequately apprised of the charges against him so as to be able to prepare a defense. The Second Circuit has explained the function of notice as follows: "[N]otice serves to 'compel the charging officer to be [sufficiently] specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.'"  *Sira v. Morton*, 380 F.3d 57, 70 (2d Cir. 2004) (quoting *Taylor v. Rodriguez*, 238 F.3d 188, 192–93 (2d Cir. 2001); *see also Wolff v. McDonnell*, 418 U.S. 539, 564 (1974) (advanced written notice allows inmate "to marshal the facts in his defense").  The court continued: "Toward this end, due process requires more than a conclusory charge; an inmate must receive notice of at least some 'specific facts' underlying the accusation."  *Sira*, 380 F.3d at 70; *see also id.* at 73 ("due process requires a modicum of factual specificity" in the written notice).  Thus, the critical question is not whether plaintiff's copy of the misbehavior report was identical to the official version or contained every piece of evidence available to the factfinder; rather, it is whether there was sufficient factual specificity to allow plaintiff to prepare his defense.

As noted by Judge Gorenstein, the misbehavior report indicated the date and time of the discovery of the contraband, its location, that the substance found was marijuana, packaged in nineteen bags, and the number and the approximate wording of the rule that was violated.  (Report 15.)  The only omission in the notice claimed by plaintiff is its

failure to state that the contraband was tested and tested positive as being marijuana. Plaintiff makes no plausible argument for why the failure to mention the testing of the substance prevented him from preparing a defense. His principal defense at the hearing was that he had no knowledge that the contraband was hidden in the pilaster next to his cell and that it did not belong to him. The omission of the fact that the substance was tested is entirely irrelevant to that defense. Plaintiff did not present a defense that the substance was not marijuana, and indeed such a defense would have undermined his actual defense. Plaintiff's focus on the discrepancy between the two reports is to no avail where he can not demonstrate that an omission in his copy of the report prevented him from preparing a defense.

Plaintiff relies heavily on *Grillo v. Coughlin*, 31 F.3d 53 (2d Cir. 1994), in arguing that his notice was insufficient, but for a number of reasons, that case is inapplicable. First, *Grillo* involved discrepancies between the official copies of urinalysis forms and those provided to the inmate. Grillo's entire defense was based on deficiencies and inconsistencies in the forms he was provided with, which had unbeknownst to him been corrected in the official version. Thus, he had chosen and pursued a defense that was "compromised when the evidence he [was] shown differ[ed] from the evidence shown to the factfinder." *Id.* at 56. Plaintiff, in contrast, neither chose a defense that was undermined by the additional sentence concerning testing, nor would have had an additional defense had he been made aware of the fact that the substance was tested. If plaintiff had presented a defense that the substance was not marijuana, arguing that the substance had never been tested, then the discrepancy would have compromised his defense and *Grillo* would be applicable. He did not.

Second, in *Grillo* the discrepancy was discovered on the last day of the proceeding, and the hearing officer made "no attempt to explore how, when, and why the official forms were altered." *Id.* at 55. Here, in contrast, the discrepancy was discovered almost immediately, and the hearing officer on his own initiative called an additional witness in an attempt to explain it. While the Supreme Court has stated that advanced notice of twenty-four hours is required, it is far from obvious that a defect in notice, if immediately discovered and investigated, will give rise to a due process violation even if it impacts the inmate's anticipated (but not yet presented) defense. Regardless, plaintiff's defense was entirely unrelated to the fact of testing so the Court need not address that question. *Grillo* is inapposite. Plaintiff's advanced written notice satisfied the requirements of procedural due process.

**II. Sufficiency of Evidence at the Hearing**

Plaintiff argues throughout his objections that there was insufficient evidence to establish constructive possession of the contraband and asserts that it was error for Judge Gorenstein to find that constructive possession was established. (*See, e.g.*, Objections 26, 36, 43.) Specifically, plaintiff calls attention to the fact that other inmates had access to the pilaster where the contraband was discovered and no instrument was recovered from his cell that could be used to obtain the contraband from the bottom of the tall, narrow pilaster.

First, plaintiff misconstrues the role of the Court. The Court is not evaluating the evidence de novo and reaching its own outcome. Rather, the Court must determine whether on the record before the disciplinary hearing officer, there was sufficient evidence to sustain the ruling. The standard by which the Court evaluates the sufficiency

of the evidence was established in *Superintendent v. Hill*, 472 U.S. 445 (1985): "We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits." *Id.* at 455; *see also id.* ("[r]equiring a modicum of evidence to support a decision"). The Court elaborated: "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455–56. While the Court in *Hill* found the evidence before the disciplinary panel to be "meager," it nonetheless found that it was "some evidence." *Id.* at 457. As Judge Gorenstein noted, the Second Circuit has "not construed the phrase 'any evidence' literally," but instead has "require[d] that the evidence be reliable." *Sira*, 380 F.3d at 488. However, reliability as used in the Second Circuit looks to the *trustworthiness* of evidence, particularly the testimony of a confidential informant or victim, or hearsay evidence. *See Taylor v. Rodriguez*, 238 F.3d 188, 194 (2d Cir. 2001) (requiring independent inquiry by hearing officer into reliability of confidential informant before accepting testimony); *Zavaro v. Coughlin*, 970 F.2d 1148, 1152 (2d Cir. 1992) (same); *Luna v. Pico*, 356 F.3d 481, 488 (2d Cir. 2004) (requiring independent inquiry by hearing officer into reliability of victim before accepting testimony); *Sira*, 380 F.3d at 78 (requiring totality of the circumstances inquiry before accepting hearsay evidence). The standard for *sufficiency* of the evidence continues to be the "some evidence" standard set forth in *Hill*. *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000) (standard satisfied if "there is any evidence in the record that supports" the disciplinary ruling).[1]

[1] Plaintiff devotes fully fifteen pages of objections to arguing that the proper standard is instead "substantial

Second, plaintiff incorrectly states that Judge Gorenstein ruled that constructive possession was established.  (*See, e.g.*, Objections 43.)  To the contrary, the Report found that the "there is a strong argument that the evidence again Johnson did not rise even to the level of 'reliable' evidence."  (Report 21.)  While Judge Gorenstein did not find it necessary to rule directly on the question because liability was precluded by qualified immunity, he found that constructive possession was arguably *not established* by sufficient evidence to comply with due process.  The Court now turns to this conclusion.  Initially, the Court does not believe it is at liberty to decline to rule on whether a constitutional right was violated.  Under *Saucier v. Katz*, the Supreme Court mandated a two-step approach to a qualified immunity defense, requiring that courts first consider the threshold question of whether a right was violated, and only then consider whether the right was clearly established.[2]  533 U.S. 194, 200–201 (2001).  While the Second Circuit has found that such a sequence is not required in a limited number of circumstances where the underlying rationale of *Saucier* does not apply, none of those exceptions are applicable here.  *See Ehrlich v. Town of Glastonbury*, 348 F.3d 48, 57–58 (2d Cir. 2003) (moving directly to qualified immunity question is appropriate where "existence of constitutional violation depends on the resolution of uncertain state law").

---

evidence."  (*See* Objections 51–66.)  New York law does require prison disciplinary rulings to be supported by "sufficiently relevant and probative" information "to constitute substantial evidence."  *Foster v. Coughlin*, 565 N.E.2d 477, 478 (N.Y. 1990).  However, plaintiff is simply wrong that this stricter state standard must be satisfied to comply with federal due process.  *See Friedl*, 210 F.3d at 85.  Because the state standard is stricter, the reversal of a disciplinary ruling on administrative appeal or review by state court based on insufficient evidence does not necessarily establish an inmate's federal due process claim.  *See Sira*, 380 F.3d at 76 n.9.  Even if it did, the reversal in this case by defendant Selsky on appeal was explicitly not based on insufficient evidence, but rather on the poor quality of the audio recording.  (Report 9.)

[2] The rationale for such a two-step inquiry is that if lower courts consistently avoided deciding on whether rights were violated, "standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals."  *County of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998).

Plaintiff argues that defendants' reliance on the constructive possession doctrine, in the absence of any direct evidence and as applied to the facts of his case, violates his due process rights. A number of courts outside this circuit have found that the constructive possession doctrine can satisfy the "some evidence" standard where only a small number of inmates have equal access to the contraband. *See, e.g.*, *Mason v. Sargent*, 898 F.2d 679, 680 (8th Cir. 1990) (holding that where *two* inmates had equal access to contraband, "some evidence" standard was satisfied); *Hamilton v. O'Leary*, 976 F.2d 341, 345–46 (7th Cir. 1992) (holding that where *four* inmates had equal access to contraband, "some evidence" standard was satisfied, but noting in dicta that where thirty-two inmates had equal access, the standard would likely not be satisfied); *Harms v. Godinez,* 829 F. Supp. 259, 264 (D. Ill. 1993) (holding that where *six* inmates had equal access to contraband, "some evidence" standard was satisfied); *but see Hamilton*, 976 F.2d at 347 (Posner, J., dissenting) (probability of guilt no greater than one in *eight* (12.5%) would not satisfy "some evidence" standard); *Cardenas v. Wigen*, 921 F. Supp. 286, 289 n.4 (D. Pa. 1996) (holding that where *twelve* inmates had equal access to contraband, "some evidence" standard was not satisfied); *Broussard v. Johnson*, 253 F.3d 874, 877 (5th Cir. 2001) (holding that where "approximately one hundred inmates" had equal access to contraband, "some evidence" standard was not satisfied).

As noted by Judge Gorenstein, plaintiff's case falls outside this line of cases because evidence demonstrated that other inmates did not have "equal access" to the contraband. (Report 21.) Rather, the testimony before the hearing officer by both a corrections officer and a staff assistant was that while it was "possible" that other inmates could have put something in the pilaster, it was unlikely they could do so without being

detected. Indeed, the fact that a fishing pole-type instrument is required to retrieve the contraband makes such a possibility even less likely. Plaintiff incorrectly suggests that the relevant probability for purposes of a constructive possession analysis is one in 132, the number of inmates in the honor block, or even one in twenty-two, the number of inmates on the floor. Instead, if the Court were to attempt to come up with a mathematical probability, it would be necessary to reduce the additional number of inmates who had "some access" to the pilaster by the likelihood that they, as opposed to plaintiff, would actually do so.[3] Because quantifying the relative levels of access would inevitably be arbitrary, the Court does not find such a numerical inquiry to be helpful. The proper conclusion depends on the facts of each particular case.

Even looking at the facts in the light most favorable to plaintiff, the court holds that the disciplinary ruling was supported by "some evidence" and thus did not violate plaintiff's procedural due process rights. First, the contraband was discovered in the pilaster adjacent to plaintiff's cell, and was accessible from inside his cell. Second, the hearing officer was not presented with evidence that any other inmate has equal access to that pilaster. Third, while two witnesses testified that it was possible that other inmates in the block, or at least on the floor, could have used the pilaster, both (including a staff assistant without any institutional interest in seeing plaintiff found guilty) found it unlikely that other inmates could do so without being caught. It is particularly unlikely that someone could retrieve the contraband with a fishing-type instrument without being detected, even more unlikely one could do so on a regular basis. Finally, a New York state court has found that the discovery of contraband in a pilaster adjacent to an inmate's

[3] For example, if inmates on plaintiff's floor with "some access" were only 20% as likely to have used the pilaster as plaintiff, then the proper probability would be 1 / 22 x 20%, or 23%.

cell was sufficient evidence of possession even under the more rigorous "substantial evidence" test. *See Nieves v. Goord*, 768 N.Y.S.2d 711, 711–12 (N.Y. App. Div. 2003) ("Notwithstanding the fact that other inmates had access to the area where the contraband was found, the fact that the contraband was found in an area within petitioner's control gives rise to a reasonable inference of possession . . . [and] provides substantial evidence to support the determination of guilt." (citations omitted)).  While Judge Gorenstein was correct that the evidence presented against plaintiff was "thin," it nonetheless amounted to "some evidence."  *See Hill*, 472 U.S. at 457 ("Although the evidence in this case may be characterized as meager, and there was no direct evidence . . ., the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.").  Therefore, the Court alters Judge Gorenstein's Report to the extent it assumed the evidence of guilt in plaintiff's hearing did not satisfy the "some evidence" standard.

        In the alternative, assuming that the evidence in plaintiff's hearing fell short of satisfying due process, Judge Gorenstein properly found that defendants were entitled to qualified immunity.  Neither the Supreme Court nor the Second Circuit has defined the contours of the "some evidence" standard when multiple inmates have equal access to contraband, let alone when inmates have different levels of access.  While a reasonably clear rule may be possible where inmates have equal access to contraband, the outcome where it is unlikely, but not impossible that other inmates could access the contraband "depends very much on the facts of each case."  *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004) (finding no clearly established right where proper outcome was heavily fact specific).  As there are no cases in this circuit finding a procedural due process violation

in circumstances similar to the case at bar, defendants plainly did not violate a clearly established right. Thus, they are entitled to qualified immunity.

**III. Violation of State Chain-of-Custody Regulations**

Plaintiff repeats the argument presented to Judge Gorenstein that his due process rights were violated when Corrections Officer Fraser failed to comply with state regulations governing handling of contraband. (Objections 36–38, 76–78.) As Judge Gorenstein correctly noted, it is federal constitutional standards, not state law or regulations, that define the requirements of procedural due process. *See Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990). Plaintiff is entitled to relief only if he can show a violation of his constitutional rights, not a violation of state laws or regulations. Due process requires that the evidence used against a prisoner in a disciplinary hearing has a "sufficient foundation." *Soto v. Lord*, 693 F. Supp. 8, 20 (S.D.N.Y. 1988); *see also Shlomo Tal v. McGann*, No. 88 Civ. 7678 (JSM), 1991 U.S. Dist. LEXIS 8129, 1991 WL 113776, at *2 (S.D.N.Y. June 17, 1991) ("When money damages are sought plaintiff must show that the chain of custody form is so untrustworthy that its use violated the due process clause."). In this case, there is evidence from Fraser that he held the contraband for a large part of the day while he conducted other searches and then transferred it to the corrections officer who tested the substance. While plaintiff may find Fraser's testimony incredible, it is not the role of the Court to evaluate the credibility of witnesses at a disciplinary hearing. *See Hill*, 472 U.S. at 455. Judge Gorenstein properly found that the chain of custody, as established by Fraser, did not render the contraband evidence so entirely unreliable as to require its exclusion to comply with due process. (Report 25.)

**IV. Sufficiency of Record on Administrative Appeal**

There is one claim brought up in plaintiff's objections and not addressed by Judge Gorenstein. That claim, properly understood, is that plaintiff's due process rights were violated when defendant Selsky reviewed plaintiff's disciplinary ruling on appeal without the aid of a complete audio recording or accurate transcript. (*See*, *e.g.*, Objections 15–18, 24–26, 31.) As evidence of the poor quality of the audio recording used in the administrative appeal, plaintiff notes first that his disciplinary ruling was ultimately reversed because of the inadequacy of the audio recording and second that defendants hired audio forensic experts to enhance the audio recording for purposes of this proceeding. Even were this due process claim to have been properly set out in the complaint, it still must fail because the Court finds no due process right to having a disciplinary ruling reviewed with the aid of a perfect audio recording or complete transcript.

First, the Court has found no case establishing that the availability of an administrative appeal of a disciplinary ruling is required by due process. In *Wolff*, the Court noted, but did not take issue with the fact that "Nebraska does not seem to provide administrative review of the action taken by the Adjustment Committee." 418 U.S. at 565. Indeed, the Supreme Court has declined to decide whether an inmate even has a due process right to a *judicial* appeal of a decision impinging on a protected liberty interest. *See Hill*, 472 U.S. at 453 ("[W]e decline to decide in this case whether due process would require judicial review."). If plaintiff has no due process right to an appeal (administrative and possibly even judicial), then *a fortiori* he has no right to an appeal based on an accurate transcript of the disciplinary hearing.

Second, even if due process required that an inmate be granted an administrative appeal, it would not require that the appeal be based on an entirely accurate and complete transcript.  While the recording of Tier III hearings is required by New York state law, it is not required to satisfy procedural due process.  *See Dixon v. Goor*d, 224 F. Supp. 2d 739, 744 (S.D.N.Y. 2002) ("While New York law requires that an electronic record of a disciplinary hearing be maintained, such a record is not constitutionally required." (citations omitted)); *Auricchio v. Goord*, 273 A.D.2d 571, 572 (N.Y. App. Div. 2000) ("[T]he failure to produce a transcript did not involve a substantial evidence issue or implicate any fundamental due process rights." (citations omitted)).  Inmates are entitled to a written statement of the disposition and evidence relied on, not to audio recordings or an accurate transcript of the proceedings.  See *Wolff*, 418 U.S. at 564–65.  If inmates may be constitutionally deprived of a liberty interest without any recording of the proceedings, then it could hardly be a due process violation for such a hearing to be reviewed without a transcript.

Of course, it is preferable to have a complete recording and accurate transcript so as to improve the ability to properly decide an administrative appeal and create a record for judicial review.  When defendant Selsky reviews a disciplinary hearing based on a poor audio recording or incomplete transcript, he does so at his own peril lest he incorrectly affirm an unconstitutional ruling.  A written record also "helps to insure that administrators, faced with possible scrutiny by state officials and the public, and perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly."  *Id.* at 565.  Nonetheless, the Court does not find that the failure to review a disciplinary hearing with the aid of a complete audio recording or accurate transcript

constitutes an independent due process violation. The due process claims against defendant Selsky succeed or fail based on the alleged violations at plaintiff's disciplinary hearing. *See Gilbert v. Selsky*, 867 F. Supp. 159, 166 (S.D.N.Y. 1994) ("If a supervisory official learns of a violation through a report or an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."); *McCormack v. Cheers*, 818 F. Supp. 584, 598 (S.D.N.Y. 1993) (looking to "whether the hearing itself was conducted in compliance with due process . . . to determine whether Selsky was personally involved in the alleged constitutional deprivations"). Because the Court has found that the disciplinary hearing did not violate plaintiff's due process rights, none of the supervisory officials are liable either.

**CONCLUSION**

Having reviewed plaintiff's new due process claim de novo, and having reviewed the Report for clear error, the Court adopts the Report and Recommendation of Magistrate Judge Gorenstein with the above modification. Defendants' motion for summary judgment **[32]** is granted and plaintiff's complaint is dismissed in its entirety. The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
March 28, 2007

Richard J. Holwell
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOHN JOHNSON, Plaintiff, | : | 04 Civ. 5919 (RJH) (GWG) |
| -v.- | : | **REPORT AND RECOMMENDATION** |
| GLENN S. GOORD, et al, Defendants. | : | |

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

John Johnson, an inmate at Eastern New York Correctional Facility, brings this action pro se pursuant to 42 U.S.C. § 1983. Johnson alleges that his due process rights were violated by defendants in connection with an April 17, 2002 disciplinary hearing and subsequent proceedings. Defendants, employees of the New York State Department of Corrections ("DOCS"), now move for summary judgment. For the reasons stated below, their motion should be granted.

## I. BACKGROUND

### A. Facts

#### 1. The Misbehavior Charges

During the relevant time period, Johnson was an inmate at Green Haven Correctional Facility, residing in the "Honor Block," also known as block D. On April 9, 2002, corrections officers "frisked" Johnson's cell as part of a large scale search of several cell blocks conducted in response to an anonymous tip indicating that inmates used pilasters to hide contraband. See Hearing Transcript ("Tr.") (reproduced as Ex. C of Declaration of John M. Schwartz in Support of Defendants' Motion for Summary Judgment ("Schwartz Decl.") (Docket #32)), at 109; see

also Unusual Incident Report, dated April 9, 2002 (reproduced as Ex. L of Declaration of Donald Selsky in Support of Defendants' Motion for Summary Judgment) ("Selsky Decl.") (Docket #34)), at D212. A pilaster is a vertical column that houses the cell's gate or locking mechanism, which although located outside the cell, is accessible from inside each of the adjacent cells as well as from outside the cells. Unusual Incident Report at D212. "The pilasters are . . . open at the top and sealed at the bottom." Id.

Although the search of Johnson's cell yielded no contraband, a search of its adjacent pilaster produced approximately 6.5 grams of a "green leafy substance" individually packaged in 19 bags and all contained within one zip-loc bag. See Fraser: Tr. 97; Inter-Departmental Communication, dated April 9, 2002 (reproduced as Ex. S to Declaration in Support of Plaintiff's Notice of Cross Motion for Partial Summary Judgment and Plaintiff's Rule 56(f) Opposition to Defendants' Motion for Summary Judgment ("Pl. Decl.") in Notice of Cross Motion for Partial Summary Judgment And Plaintiff's Rule 56(f) Opposition to Defendants' Motion for Summary Judgment) ("Pl. Notice of Cross Motion") (Docket #41). This substance tested positive for marijuana. See Kelly: Tr. 29-30; Request for Test of Suspected Contraband Drugs Sheet, dated April 9, 2002 (reproduced as Ex. F. of Schwartz Decl.).

Johnson was not present during the search of his cell. See Pl. Decl. ¶ 2. He learned of the search only after he had been ordered back to his cell, where he found a contraband receipt indicating that no contraband had been found. Id. The next day, at approximately 7:20 p.m., he was apprised of the charges against him when Corrections Officer ("C.O.") Smith served him with a Misbehavior Report written by C.O. Fraser. See id. at ¶ 5; see also Inmate Misbehavior Report, dated April 9, 2002 (reproduced as Ex. N of Selsky Decl.) ("Report"). The Report

stated: "On the Above date and Approximate time of 9:00 a.m. I [sic] C.O. C. Fraser was conducting a Cell Search of Cell D-5-14 Housing Inmate Johnson. . . .While Frisking [sic] Cell I found 19 bags of Marijuana Weighing Approximately 6.5 grams in the Cell pillister [sic] of Cell D-5-14." Id. The Report then indicated that this finding constituted a violation of Rule 113.25 of the Institutional Rules of Conduct of the New York State prison system, specifying "[i]nmates [s]hall not make, possess, sell or [e]xchange any [c]ontrolled [s]ubstance." Id.

2. Johnson's Disciplinary Hearing

On April 17, 2002, Hearing Officer Jeff Richards ("Richards") commenced a Tier III Superintendent's hearing pursuant to 7 NYCRR §§ 254.1-254.9 ("the hearing"). The hearing, which was held over the course of six days, was tape recorded. Johnson pleaded not guilty to the offense of possession. (Johnson: Tr. 11). Before he called his first witness, an issue arose concerning the authenticity of the Misbehavior Report served on Johnson. See Tr. 8-13. When Richards read his copy of the Misbehavior Report into the record, Johnson noted that the official Report differed from the Report served upon him. Specifically, at the end of the section entitled "Description of Incident," only Richards' copy of the report stated "substance tested positive by C.O. M. Kelly." Id. at 10. Richards acknowledged the discrepancy on the record and informed Johnson that he would call C.O. Fraser, the author of the Report, as an additional witness to explain the difference. Id. at 10, 13.

A significant portion of the hearing was dedicated to this discrepancy. At different times throughout the proceedings Johnson returned to this issue, complaining that it was "not harmless error;" it was "falsification." (Johnson: Tr. 12-13). Four witnesses testified regarding the Report. C.O. Fraser confirmed that he had filled out the entire Report at one time, adding nothing later.

C.O. Smith, who delivered the Report to Johnson, testified that she had not altered the Report. C.O. Kelly, who tested the substance found in the pilaster and countersigned the Report, confirmed that she had witnessed C.O. Fraser write the disputed sentence on the Report. (Richards: Tr. 10; Fraser: Tr. 20; Kelly: Tr. 30; Smith: Tr. 56). Finally, Lieutenant Tokarz, charged with reviewing the misbehavior reports, testified that he typically did not compare the original with the inmate's copy and thus, would not notice such a discrepancy. (Tokarz: Tr. 116). Although no one could provide an explanation for the discrepancy, C.O. Fraser suggested that perhaps a piece of paper inadvertently "may have slipped between the two sheets." (Fraser: Tr. 20).

The rest of the hearing addressed the evidence against Johnson. Johnson called two witnesses to rebut the prison's theory that he could be charged with possession of the marijuana. Johnson first addressed C.O. Collins, Johnson's assigned assistant in this matter. C.O. Collins, who had inspected the pilasters in block D on Johnson's behalf, testified that access to the pilaster is "not restricted to the cell." (Collins: Tr. 16-17). "It's possible the cell, on either side, the inmate could approach it at any time and also from the outside, even though someone on the outside could probably be observed, unless they're like a porter or someone else that's commonly in the area all the time." Id. at 17. Moreover, C.O. Collins indicated that if someone other than the occupant of the cell had put something in the pilaster, the occupant "would almost have to know unless he was dead asleep." Id. He also testified that if the inmate "was working and away from the area, it's possible that he not know [sic] it was in [the pilaster]." Id. at 17.

Johnson also questioned C.O. Sanyo, assigned to D block at the relevant time period, about the degree of freedom on the Honor Block. Specifically, Johnson asked him to explain the

difference between "open company" and "closed company" and the procedure on the block for opening the cells.[1] (Sanyo: Tr. 65-67). Although it is not clear from his testimony whether D block is open or closed, the following colloquoy with C.O. Sanyo gives some indication of the procedure there:

> [Inmate John Johnson]: . . . . Who was watching the movements and activities of the inmates on the open company?
>
> [Hearing Officer Jeff Richards]: Is there anybody observing all the movement and activity on open company when it's open?[2]
>
> [C.O. Sanyo]: I can't speak for all officers, but I know I . . . If I opened up on the (inaudible) deck, I went up about every three [to] four minutes and checked (inaudible).
>
> [Hearing Officer Jeff Richards]: Periodically . . .
>
> [C.O. Sanyo]: Even though that was open for fifteen, I was up there checking to make sure (inaudible) company.
>
> [Hearing Officer Jeff Richards]: Okay.
>
> [Inmate John Johnson]: Would you say, would you say that there is an opportunity for anyone else to walk up and down the open company line?
>
> [Hearing Officer Jeff Richards]: Was there an opportunity . . . Is there an opportunity, while the galleries are open, that somebody could have put something in the pilasters or in the cells, in another cell in the area?
>
> [Inmate John Johnson]: While he's upstairs running the option.
>
> [Hearing Officer Jeff Richards]: While you're upstairs running the (inaudible).

---

[1] C.O. Sanyo explained: "Open company is open all night after chow is run." (Sanyo: Tr. 65). Closed company "is opened cells periodically, about three times a night." Id. Every hour, on the hour, cells are opened for 15 minutes. (Richards: Tr. 68).

[2] At the hearing, Johnson stated his questions and Richards would then pose them to the witness.

[C.O. Sanyo]: Actually, that could happen on the open deck.

[Inmate John Johnson]: That's what I'm asking.

[C.O. Sanyo]: I mean, I'm not saying . . . I don't think it did.

[Inmate John Johnson]: That's what I'm asking.

[C.O. Sanyo]: Because I know every inmate (inaudible), but I don't think it happened, but I'm not saying it couldn't happen because you got 22 guys on each company, and they're open all night, even it's [sic] the open company.

[Hearing Officer Jeff Richards]: Yeah.

[Inmate John Johnson]: That's what I'm asking. On open company, is it possible . . .

[Hearing Officer Jeff Richards]: If it's possible, then yes, yes, it's possible.

(Tr. 68-70).

Johnson also took issue with the chain of custody connecting him to the drugs. See Tr. 94-97. Specifically, Johnson questioned whether C.O. Fraser's handling of the marijuana comported with "policy and procedure." (Johnson: Tr. 94). C.O. Fraser explained that upon recovery of the contraband, he "placed [it] in a bag with the inmate's name, DIN number and cell and [it] remained in my hands, in my custody the entire time until such time as I turned it over to Officer Kelly." (Fraser: Tr. 95). Upon further questioning, C.O. Fraser indicated that he carried the marijuana "in [his] hand" throughout subsequent searches of the pilasters in cell block C, but maintained that this was not "in contradiction of policy." (Fraser: Tr. 95-96; Richards: Tr. 95). Nonetheless, Johnson concluded that it was "incredible for [him] to believe that from 9 in the morning until 4 p.m. in the afternoon, that the officer stated that he held contraband in his hand, not in his pocket, in his hand, and conducted another complete search, helped conduct another complete search in another block." (Johnson: Tr. 97).

Finally, Johnson himself addressed the insufficiency of the evidence against him. First, he highlighted his frequent absence from the cell, arguing "this absence does not substantiate me having control of [the] pilaster [sic] that are adjacent to [the] cell and accessible to anyone." (Johnson: Tr. 108). Specifically, he explained:

> I work in the gym at night time as a volunteer [sic] so we left at 5:45, 5:50 is (inaudible) from that time all the way until 9:00 I'm not in the block, and I do this on a continued basis. I work with industry during the day time. So I had no idea what was going on, and was surprised when they even brought me the Misbehavior Report, that's why I (inaudible) didn't receive, the only contraband slip I received was no contraband found, no damage done."

(Johnson: Tr. 34).

An issue also arose regarding Johnson's ability to retrieve any contraband from the pilaster. C.O. Fraser had testified that "[w]e used fishing line sinkers (inaudible) with twine approximately eight feet long, wrapped tape around it and dropped it down there (inaudible)." (Fraser: Tr. 26-27). Johnson noted that "these findings also do not substantiate rule 113.25, that I had any tools or material that could be used to retrieve anything from the pilaster, such a[s] C.O. Fraser testified he used, fishing yarn, hammered down hooking device, tape to retrieve marijuana." (Johnson: Tr. 107).

Johnson closed his arguments as follows: "I have argued that based on different testimony by staff, many inmates had access to pilasters, therefore, I cannot be held solely responsible." (Johnson: Tr. 109).

On April 26, 2002, Richards found Johnson guilty of "drug possession" in violation of Rule 113.25. (Richards: Tr. 118). In explaining his decision, he stated that the "evidence I relied upon was [sic] the statements of Inmate [sic] Fraser's testimony, he said the drugs were found in the pilaster of cell D-514, this area is (inaudible) responsibility." Id. Richards

sentenced Johnson to 365 days in the Special Housing Unit ("S.H.U.") with the loss of good time and certain privileges. Id. at 119. Richards gave his opinion both orally in Johnson's presence, and in a subsequent written statement on a standard Department of Corrections form, including sections entitled "Statement of the Evidence Relied Upon" and "Reasons for Disposition." Superintendent Hearing Record Sheet, dated April 26, 2002 (reproduced as Ex. A of Selsky Decl.) ("Hearing Record Sheet"), at D167.

3. Johnson's Appeals

______Johnson exercised his right to review by the Superintendent under 7 NYCRR § 254.9, which resulted in a decision affirming the Hearing Officer's findings. See Letter to Charles Greiner, dated May 6, 2002 (reproduced as Ex. B. to Selsky Decl.). First Deputy Superintendent of Green Haven Paul Richards ("P. Richards") determined that the "hearing was properly conducted and the disposition rendered was appropriate." Discretionary Review Decision, dated May 9, 2002 (reproduced as Ex. C of Selsky Decl.).

Pursuant to 7 NYCRR § 254.8, Johnson appealed this decision to the New York State Commissioner of Corrections, defendant Glenn S. Goord. See Appeal Form to Commissioner, dated May 20, 2002 (reproduced as Ex. D of Selsky Decl.). The appeal was reviewed by the Director of Special Housing/Inmate Disciplinary Program of DOCS, defendant Donald Selsky. See Selsky Decl. ¶ 14-15. Two members of defendant Selsky's staff examined the hearing record and the exhibits submitted at the hearing, see Selsky Decl. ¶ 15, listened to the proceedings recorded on audiotape, and recommended affirmance. See SYSM Outbasket Print, dated June 20, 2002 (reproduced as Ex. F of Selsky Decl); Disciplinary System Tier 3 Appeal Decision Screen Print-out, dated August 22, 2005 (reproduced as Ex. G of Selsky Decl.). On

July 29, 2002, defendant Selsky affirmed the determination of the Hearing Officer. See Review of Superintendent's Hearing, dated July 29, 2002 (reproduced as Ex. E of Selsky Decl.).

Thereafter, on August 2, 2002, Johnson sought judicial review through an Article 78 proceeding commenced in New York State Supreme Court, Albany County. See Order to Show Cause, dated August 20, 2002 (reproduced as Ex. H of Selsky Decl.), at 1-2; Statement of Facts in Support of Order to Show Cause, dated August 2, 2002 (reproduced as Ex. H to Selsky Decl.), at 6-13; Verified Petition, not dated (reproduced as Ex. H of Selsky Decl.), at D3-5. The Supreme Court transferred the case to the Court of Claims, but before the court heard the case, Selsky "administratively reversed the determination and directed that references to the hearing be expunged from [Johnson's] record." Review of Superintendent's Hearing, dated April 16, 2003 (reproduced as Ex. I of Selsky Decl.). Selsky explained that he "reversed after discussion with [the] Attorney General's Office, due to incomplete hearing record. Transcript cannot be made from hearing tape." Memorandum, dated April 16, 2003 (reproduced as Ex. J. to Selsky Decl.). The administrative reversal was based on his "experience . . . that transcription problems . . . present obstacles to the court in reviewing the hearing." Selsky Decl. ¶ 19. The reversal, however, did "not represent a change in the assessment . . . of the merits of [Johnson's] appeal or of the correctness of either the procedure or the determination at the hearing." Id. As a consequence of this administrative reversal, the Court of Claims dismissed the Article 78 proceeding, holding that Johnson had "received all the relief to which he is entitled." Decision and Order, dated May 1, 2003 (reproduced as Ex. K of Selsky Decl.).

B. Procedural History

Johnson filed the instant case pro se in June 2004 in the United States District Court for

the Eastern District of New York, which transferred the case to this Court on July 29, 2004. Following discovery, the defendants filed the instant motion for summary judgment on May 30, 2006. Principally, they argue that Johnson suffered no violation of his constitutional rights. See Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed May 3, 2006 (Docket #33) ("Def. Mem."), at 6-22. Additionally, defendants assert that they enjoy qualified immunity from suit. Id. at 22-25. Johnson has opposed the motion. See Pl. Notice of Cross Motion at 1-2; Plaintiff's Memorandum of Law In Support of Cross Motion for Summary Judgment And Plaintiff's Rule 56(f) Opposition to Defendants' Motion for Summary Judgment, dated July 5, 2002 (Docket #42) ("Pl. Mem."). Johnson also seeks partial summary judgment against defendants based on the insufficiency of evidence supporting his determination of guilt. Id. at 2. The defendants submitted a reply memorandum along with an additional declaration in support of their motion. See Defendants' Reply Memorandum of Law in Support of Motion for Summary Judgment, filed August 7, 2006 (Docket #38) ("Def. Reply"); Reply Declaration of John M. Schwartz in Support of Defendants' Motion for Summary Judgment, filed August 7, 2006 (Docket #39) ("Schwartz Reply Decl."); Declaration of William Keyser, filed August 7, 2006 (Docket #40) ("Keyser Decl."). The plaintiff submitted a sur-reply memorandum and a declaration. See Plaintiff's Reply Memorandum of Law in Support of Cross Motion for Summary Judgment, dated August 25, 2006 (Docket #44); Reply Declaration in Support of Plaintiff's Cross Motion for Partial Summary Judgment, dated August 25, 2006 (Docket #43) ("Pl. Reply Decl.").

During the course of this litigation, the defendants undertook to enhance the quality of the audio tapes from the hearing. Def. Mem. at 5-6. Thus, the hearing transcript presented to

this Court differs from the one available as part of the administrative review. Johnson asserts broadly that the transcript does not represent a "true and accurate copy of the Transcribed Hearing Tapes of the day in question." See Plaintiff's Response to Declaration of John M. Schwartz in Support of Defendants' Motion for Summary Judgment, dated July 5, 2006 (reproduced in Pl. Notice of Cross Motion) ("Pl. Resp."), at 1. But he cites only to a few minor instances in which he questions the transcript's accuracy. Id. at 1-2. The defendants agree with some of these corrections and dispute others. See Schwartz Reply Decl. ¶¶ 3(a), (b). It is not necessary to resolve this issue, however, since these discrepancies have no bearing on the disposition of this case.

II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). A genuine issue of material fact "may reasonably be resolved in favor of either party" and thus should be left to the finder of fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed" and the court must draw "all justifiable inferences" in favor of the non-moving party. Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)). Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must

come forward with 'specific facts showing that there is a genuine issue for trial,'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (alteration in original), and "may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases). In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256. Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." Nebraska v. Wyoming, 507 U.S. 584, 590 (1993) (quoting Celotex, 477 U.S. at 322) (internal quotation marks omitted) (alteration in original). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." Allen v. Cuomo, 100 F.3d 253, 258 (2d Cir. 1996) (citing Anderson, 477 U.S. at 247-48).

## III. DISCUSSION

### A. Section 1983 and Qualified Immunity

To assert a claim under 42 U.S.C. § 1983, a plaintiff must show that he has been deprived of a right secured by the Constitution or federal law by a defendant acting under the color of state law. 42 U.S.C. § 1983; West v. Atkins, 487 U.S. 42, 48 (1988). Section 1983 does not grant any substantive rights, but rather "provides a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution or federal statutes. See Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), cert. denied, 512 U.S. 1240 (1994).

A finding of constitutional violation in and of itself does not entitle a plaintiff to relief.

The doctrine of qualified immunity precludes civil liability where either prison officials performing discretionary functions "did not violate clearly established law," or "it was objectively reasonable for the defendant[s] to believe that [their] action[s] did not violate such law." Anderson v. Recore, 317 F.3d 194, 197 (2d Cir. 2003) (citations and internal quotations omitted); accord Ford v. McGinnis, 352 F.3d 582, 596 (2d Cir.2003) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); see Hope v. Pelzer, 536 U.S. 730, 739 (2002) (qualified immunity ensures that defendants have "fair notice" that their conduct is unlawful before being exposed to liability and that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right'") (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

Because defendants do not dispute that their actions were under the color of state law, the two issues presented are whether Johnson has alleged any violations of a constitutional right and, if so, whether the defendants enjoy qualified immunity from suit.

B. Johnson's Due Process Claims

Johnson claims that defendants violated his right to due process under the Fourteenth Amendment, citing deficiencies during the conduct of his disciplinary hearing and his appellate proceedings that purportedly render the hearing, its outcome and the appellate process constitutionally infirm. Pl. Mem. at 6. "[I]t has long been clear that inmates retain due process rights in prison disciplinary hearings." Hanrahan v. Doling, 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (citing cases). However, it is equally clear that prison inmates do not enjoy "the full panoply of rights" accorded a defendant in a criminal prosecution. Wolff v. McDonnell, 418 U.S. 539, 556 (1974). To prevail, Johnson "must establish (1) that he possessed a liberty interest

and (2) that the defendant(s) deprived him of that interest as a result of insufficient process," Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004) (quoting Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001)). The defendants concede that Johnson's confinement for 365 days in the S.H.U. is a sufficient deprivation of a liberty interest to require procedural due process protections. See Def. Mem. at 7 n.3. Thus, we turn to the question of whether the disciplinary hearing comported with due process.

Johnson appears to be alleging the following errors: (1) an "altered misbehavior report" denied him the "right to receive notice in advance of the charges" and "prepare a substantial defense;" (2) the Misbehavior Report was "legally insufficient and defective" and "lack[ed] specific facts tending to establish the elements of the violations charged;" (3) the Misbehavior Report upon which the hearing officer relied "cannot in and of itself establish 'substantial or some evidence;'" (4) a reasonably reliable "chain of custody" was not established; (5) the drug testing procedures were flawed; and (6) the hearing officer as well as those in charge of the appellate process were biased. Pl. Mem. at 16, 24-64. We address these claims below.

1. Sufficiency of the Misbehavior Report

Under the Fourteenth Amendment, the following procedural protections are required in disciplinary hearings when the length or conditions of confinement trigger due process protections: "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken." Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004) (citing Kalwasinski v. Morse, 201 F.3d 103, 108 (2d Cir. 1999)); accord McCann v. Coughlin, 698 F.2d 112, 121-22 (2d Cir. 1983); Higgins v.

Coombe, 2002 WL 362776, at *2 (S.D.N.Y. Mar. 6, 2002); Silva v. Sanford, 1998 WL 205326, at *6 (S.D.N.Y. Apr. 24, 1998). With respect to notice, "the Constitution [does not] demand[] notice that painstakingly details all facts relevant to the date, place, and manner of charged inmate misconduct; but there must be sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense." Sira v. Morton, 380 F.3d 57, 72 (2d Cir. 2004) (citing Wolff, 418 U.S. at 564). As to the timing of the notice, the Supreme Court has held that an inmate must be given at least 24 hours to prepare his or her defense. Wolff, 418 U.S. at 563-4.

Here, the Misbehavior Report was served on Johnson seven days in advance of the hearing. It indicates the date and time of the discovery of the contraband as well as its location. It describes the substance found as marijuana and details the quantity, 19 bags. The Report also identifies the infraction at issue not only by number, but also by paraphrasing the text of the rule. See Report. Thus, it adequately apprised Johnson of the charges against him. That Johnson was able to ask pertinent questions of witnesses in an attempt to disprove the possession charge belies his argument that he "could not prepare any type of defense or prepare questions to the vague Misbehavior Report." Pl. Decl. ¶ 25.

Johnson attacks the validity of the report by emphasizing the discrepancy between the original Report and the copy he was given. Pl. Mem. at 6. The two versions of the report differ only in the sentence that indicated that the "substance tested positive for marijuana by C.O. M. Kelly." See (Tr. 8-13). This statement could hardly have taken Johnson by surprise given that the Report itself stated that "19 bags of Marijuana Weighing Approximately 6.5 grams" had been found in the pilaster adjacent to Johnson's cell. Johnson has not shown that the indication in the

report that the substances had been the subject of a test in any way affected his ability to prepare a defense. Nor could he, given that his defense was based on his contention that he had no knowledge of the substance that was found. See, e.g., Kalwasinski, 201 F.3d at 108 (where hearing evidence was more specific than notice, the lack of specificity did not "impair [the inmate's] ability to prepare his defense, especially since his defense was simply that [the officer's] entire report was a fabrication") (citing Benitez v. Wolff, 985 F.2d 662, 665 (2d Cir. 1993)).

Grillo v. Coughlin, 31 F.3d 53 (2d Cir. 1994), upon which Johnson relies, see Pl. Mem. at 17-18, is inapposite. Grillo involved a disciplinary hearing where there was a material discrepancy between forms given to the inmate and those before the hearing officer at the hearing. The hearing officer "made no attempt to explore how, when, and why the official forms were altered." 31 F.3d at 55. The hearing was held to violate due process because the inmate was "required to mount his defense referring to prison documents that, unbeknownst to him, differ[ed] from those before the hearing officer." Id. at 56. While the discrepancy was eventually revealed, Grillo held that the inmate was entitled to show that he had by that time "already suffered from an ineffectual defense resulting in part from his ignorance of the content of the documents used as evidence against him." Id. Here, by contrast, Johnson knew from the beginning that he was being charged with possession of marijuana, he had every opportunity to explore the discrepancy in the documents, and the hearing officer took testimony on the issue. (Johnson: Tr. at 8-13; Fraser: 19-20; Smith: 30-31; Tokarz: 116-117). Indeed, upon learning of the discrepancy, the hearing officer himself called an additional witness in an effort to understand "how, when, and why the official forms" were different. Id. at 55.

Johnson also argues that the Report did not "on its face . . . substantiate a constructive possession charge as a matter of law" because it did not set forth "non-hearsay" facts proving that Johnson possessed the contraband – such as indicating that a confidential informant had provided information that Johnson had knowledge. See Pl. Mem. at 15. But there is no legal requirement that the notice provide such detail. Rather, a notice must "'be [sufficiently] specific as to the misconduct with which the inmate is charged' to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." Taylor v. Rodriguez, 238 F.3d 188, 192-193 (2d Cir. 2001) (quoting McKinnon v. Patterson, 568 F.2d. 930, 940 n.11 (2d Cir. 1977), cert. denied, 434 U.S. 1087 (1978)). Here, there was nothing vague about the charge against Johnson. The Report made clear that the contraband had been found in the pilaster next to his cell and that he was therefore being charged with possession of that contraband. Due process requires that the inmate be informed of the facts underlying the offense sufficient for the inmate to "understand what conduct is at issue." Sira, 380 F.3d at 72 (emphasis added). It does not require the prison to set forth its planned proof of those facts.

2. Sufficiency of the Evidence at the Hearing

To comport with due process, the written findings of a prison disciplinary hearing must be based on "some evidence." Superintendent v. Hill, 472 U.S. 445 (1985). This standard is satisfied if "there is any evidence in the record that supports" the decision. Friedl v. City of New York, 210 F.3d 79, 85 (2d Cir. 2000) (emphasis in original). In Hill, the Supreme Court held that the Constitution "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." 472 U.S. at 455. Nor does "[t]he

Federal Constitution . . . require evidence that logically precludes any conclusion but the one reached by the disciplinary board." Id. at 457. Neither the Second Circuit nor the Supreme Court "has clearly defined standards for determining what constitutes 'some evidence' in the context of prison disciplinary hearings; rather, decisions have addressed the problem piecemeal, focusing on the discrete problems raised by the facts of particular cases." Sira, 380 F.3d 57 at 81 (internal quotation and citation omitted). The Second Circuit, however, "has not construed the phrase 'any evidence' literally." Luna, 356 F.3d at 488. (internal quotation and citation omitted). Rather, it "requires that the evidence be "reliable" indicia of the inmate's guilt. Id. (citing Taylor, 238 F.3d at 194); Zavaro v. Coughlin, 970 F.2d 1148, 1152 (2d Cir. 1992)).

Case law suggests that, in conducting this review, a court is limited to the record of the disciplinary hearing. See generally Hill, 472 U.S. at 455-56 ("the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board"); Sira, 380 F.3d at 69 ("judicial review of the written findings required by due process is limited to determining whether the disposition is supported by some evidence . . . [which] is satisfied where there is any evidence in the record which supports the disciplinary ruling.") (citing Hill, 472 U.S. 445) (internal quotations omitted) (emphasis omitted); Hamilton v. O'Leary, 976 F.2d 341, 346 (7th Cir. 1992) ("only evidence that was presented to the Adjustment Committee is relevant to th[e] analysis). Thus, to the extent additional evidence has been offered by the parties relating to Johnson's guilt or innocence of the charges, see Keyser Decl.; Pl. Reply Decl. (attaching affidavits of other inmates) – as opposed to background information to assist the Court in understanding evidence offered at the hearing — we do not consider such evidence here.

a. Evidence of Possession; (i). Merits. The written disposition indicated that the decision relied upon evidence that (1) the contraband was found in the pilaster adjacent to Johnson's cell and (2) this area was "within the inmates [sic] area of responsibility." See Hearing Record Sheet at D167; see also Selsky Decl. ¶ 25 (indicating that prison policy holds inmate responsible for an area "reachable by the inmate . . . even if others can reach it as well").

Johnson's principal argument is that he could not have been found to have possessed the marijuana because all 132 inmates in the Honor Block, or at least the 22 on his floor, had access to the pilaster. Pl. Mem. at 12-14. Although Johnson gave the 132 number for the first time on the briefing of this motion, at the hearing he raised the possibility that "anybody at any given time" could have used the pilaster next to his cell to store contraband. (Johnson: Tr. 108). Both C.O. Collins and C.O. Sanyo acknowledged the possibility that any inmate on the Honor Block could have used the pilaster to store something. (Collins: Tr. 16-17; Sanyo: Tr. 68-70). C.O. Sanyo referred to there being "22 guys on each company" – apparently referring to inmates who were potentially not locked in their cells and thus who might have had access to the pilaster during certain periods (Sanyo: Tr. 70). C.O. Sanyo confirmed that Johnson was a regular volunteer at the gymnasium (Sanyo: Tr. 63-64), thus supporting Johnson's contention (Johnson: Tr. 108) that if a third party had put something in the pilaster, Johnson would not have necessarily been in his cell to be aware of it.

Nonetheless, both officers opined that it was improbable that an inmate other than Johnson could obtain access to the pilaster with any regularity. Thus, C.O. Collins testified that in all likelihood, an inmate attempting to use the pilaster to store contraband would have been "observed, unless they're like a porter or someone else that's commonly in the area," and

apprehended. (Collins: Tr. 17). Officer Sanyo doubted that an inmate would go undetected because he "went up about every three [to] four minutes and checked" on the inmates. (Sanyo: Tr. 69).[3]

The question before the Court is whether there was some "reliable" evidence to support the prison's position. Certainly, the prison could not show Johnson's guilt based merely on the fact that he was among some larger group of inmates who must have been aware and in control of the materials. For example, in Zavaro, the Second Circuit found that there was insufficient evidence that an inmate participated in a riot in a mess hall where the guard's testimony merely "place[d the inmate] in the mess hall at the time of a riot with widespread participation." 970 F.2d at 1153.

There is some case law considering the question of the evidence needed to charge an inmate with possession of contraband that was not actually found on the inmate's person. In many of these cases, more than one inmate had equal access to the area where the contraband was found and courts have thus considered how many inmates had such access. See Broussard v. Johnson, 253 F.3d 874 (5th Cir. 2001) (escape tool found where inmate worked not reliable evidence of possession because 100 inmates had access to the same area); Hamilton, 976 F.2d at 345-46 (evidence was sufficient to satisfy "some evidence" standard where inmate was one of four with access to area where contraband was found, but noting in dictum that if inmate were one of thirty-two with access, evidence would have been insufficient); Mason v. Sargent, 898

[3]While Johnson now states that it is "scientifically and realistically impossible for any inmate to be able to access the pilaster from inside their cells because of the pilasters [sic] position outside of and adjacent to the cells," Pl. Decl. at ¶ 39, this claim is not part of the hearing record and thus we do not consider it. Moreover, the testimony at the hearing was to the contrary. (Collins: Tr. 17).

F.2d 679, 680 (8th Cir. 1990) ("some evidence" standard satisfied where two inmates shared the locker where contraband was found and the other inmate admitted putting the contraband there); Terrell v. Godinez, 966 F. Supp. 679, 684 (N.D. Ill.1997) (evidence sufficient where seven other inmates had access to area and inmate failed polygraph examination).

Johnson's case does not fall within this line of authority because there was evidence in the record that other inmates did not in fact have equal access to the pilaster. While the officers conceded that the pilaster was accessible from outside the cell, that there was relative freedom of movement on the Honor Block, and that it was "possible" that "anybody" could put something in the pilasters (Sanyo: Tr. 70; See Collins: 16-17), they both thought it unlikely any inmate could access the pilaster from the hall undetected by either Johnson or guards unless he were a porter or someone else "commonly in the area all the time." (Collins: Tr. 17; see also Sanyo: Tr. 68-70).

It cannot be gainsaid, however, that the evidence presented against Johnson was thin. The record is simply unclear as to the basis of the guards' view that any prisoners other than Johnson would have been detected had they attempted to place items into the pilaster. In light of the absence of clarity or detail as what the guards would have been able to see with respect to the pilaster and why, there is a strong argument that the evidence against Johnson did not rise even to the level of "reliable" evidence. Luna, 356 F.3d at 488. This conclusion is bolstered by the fact that C.O. Fraser testified that in order to retrieve the contraband from the pilaster, an inmate would have to employ an instrument similar to a fishing rod (Fraser: Tr. 26-27) and it was apparently uncontroverted that no such instrument was found in Johnson's cell.

It is not necessary, however, to rule directly on this point because, as described in section

III.B.2(a)(ii) below, the officers are protected by the doctrine of qualified immunity. See Vives v. City of New York, 405 F.3d 115, 118-19 (2d Cir. 2005) (avoiding question of determining whether a constitutional right was violated to decide the case instead on qualified immunity grounds).

(ii). Qualified Immunity. As previously noted, if a constitutional right has been violated, the government employee is entitled to qualified immunity "'if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" Anderson v. Recore, 317 F.3d at 197 (quoting Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250 (2d Cir. 2001)).

"A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" Anderson v. Recore, 317 F.3d at 197 (alterations in original) (quoting Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998)). For a right to be clearly established, it is not sufficient for a general constitutional right to have been recognized; rather, the right must be established in "a more particularized . . . sense," Anderson v. Creighton, 483 U.S. at 640 – that is, "in light of the specific context of the case." Saucier v. Katz, 533 U.S. 197, 201 (2001). Thus, the relevant inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202; see also Hope, 536 U.S. at 741 (the "salient question" is whether the state of the law at the time of the violation gave officers "fair warning"). "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment

based on qualified immunity is appropriate." Saucier, 533 U.S. at 202 (citing Malley v. Briggs, 475 U.S. 335, 341 (1986)).

Here, Johnson's due process right to be convicted based on "reliable" evidence was clearly established in the general sense by virtue of Second Circuit case law. But no case made clear to the officers that reliance on the type of evidence used to convict Johnson was improper. Thus, none of the defendants were "put . . . on notice" that finding Johnson guilty of the infraction would be "clearly unlawful." Saucier, 533 U.S. at 202. While Johnson is not required to show a court decision squarely on point indicating the violation of his constitutional rights in order to defeat the qualified immunity defense, see Anderson v. Creighton, 483 U.S. at 640, the Supreme Court has made clear that where the results of the qualified immunity inquiry depend "very much on the facts of [the] case," the "clearly established" test is not met. Brousseau v. Haugen, 543 U.S. 194, 201 (2004). As was true in Luna v. Pico, "at the time of [the officers'] decisions, a reasonable hearing officer would not have known that the quantum of evidence relied on by [the officers] was clearly an insufficient basis for finding [the inmate] guilty." 356 F.3d at 490.

Notably, two of the bases mentioned by Luna in support of this conclusion are applicable here. First, there is apparently no Second Circuit or Supreme Court authority that talks of the nature of evidence required to find possession of contraband in areas that are not in the exclusive control of the inmate charged. See id. at 490. Second, "there is state law that at least arguably supports defendants' position." Id. at 490. In Nieves v. Goord, 2 A.D.3d 1173 (3d Dep't 2003), contraband was found hidden inside a pilaster which was accessible from inside petitioner's cell. The Third Department held that "[n]otwithstanding the fact that other inmates had access to the

Case 1:04-cv-05919-RJH-GWG Document 51 Filed 03/28/07 Page 39 of 48

area where the contraband was found, the fact that the contraband was found in an area within petitioner's control gives rise to a reasonable inference of possession." Id. at 1174.

In sum, the state of the law at the time of Johnson's hearing did not give the officers "fair warning" that their conviction of Johnson for misconduct was unlawful. Hope, 536 U.S. at 741. As the Second Circuit has noted, "[t]he primary goal of qualified immunity is to permit government officials to act in areas of legal uncertainty without undue fear of subsequent liability." Hanrahan, 331 F.3d at 98. Johnson's case represents such an instance. Because "no rational jury could fail to conclude that it was objectively reasonable for the defendants to believe that they were acting in a fashion that did not violate a clearly established right;" Williams v. Greifinger, 97 F.3d 699, 703 (2d Cir. 1996) (quoting In re State Police Litig., 88 F.3d 111, 123 (2d Cir. 1996)), Johnson cannot succeed on this aspect of his claim.

b. Chain of Custody and the Validity of the Drug Test

Johnson argues that the evidence with regard to the chain of custody was insufficient to support a finding of guilt. He asserts that C.O. Fraser violated 7 NYCRR § 1010.4(c), which provides that if a substance that is suspected of being a contraband drug "is not to be identified immediately, it shall be secured in a locked contraband locker or other appropriate secure place with limited access." Pl. Decl. ¶ 23; see also Pl. Mem. at 27-28. He also questions the validity of the drug test, arguing that the prison improperly failed "to give a statement of the scientific princip[les] and validity of the testing materials and procedures used;" that "there was no evidence presented from which it could be concluded that the test and its ampoules used with it had been tested within a reasonable time in relation to test [sic] and found to be properly calibrated and in working order at time [sic] test was conducted;" that "the chemicals used in

Case 1:04-cv-05919-RJH-GWG Document 51 Filed 03/28/07 Page 40 of 48

conducting test [sic] were of proper kind and mixed or blended in proper portions or that N.I.K. was operated properly during test [sic];" and that C.O. Kelly "failed to conduct a confirmation test." Pl. Mem. at 28-29.

None of these show that Johnson has been subject to a due process violation. First, it is well-settled law that "a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law." Rivera v. Wohlrab, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002); see also Hyman v. Holder, 2001 WL 262665, at *6 (S.D.N.Y. 2001); cf. Russell v. Coughlin, 910 F.2d 75, 78 n. 1 (2d Cir. 1990) ("Federal constitutional standards rather than state law define the requirements of procedural due process."). Thus, the claim that the prison violated a state rule or regulation is of no consequence.

Nonetheless, due process requires that the evidence used against a prisoner in a disciplinary proceeding have a "sufficient foundation." Soto v. Lord, 693 F.Supp. 8, 20 (S.D.N.Y. 1988); see also Rivera, 232 F. Supp. 2d at 124. Here, the evidence at the hearing indicated that there was no disruption in the chain of custody. The sole evidence in this regard consisted of C.O. Fraser's testimony. According to C.O. Fraser, upon discovery of the marijuana, he did not identify the substance immediately or secure it in a locked contraband locker; instead, he held it from around 9:00 a.m. to about 4:00 p.m., through several subsequent searches. (Tr. 95-97). At 4 p.m. he transferred the substance from his person to C.O. Kelly, who tested the substance. (Tr. 92-93). While Johnson agues that Fraser's testimony is incredible, see Pl. Decl. ¶ 24, this Court may not make judgments on the credibility of witnesses at a prison disciplinary hearing. See Hill, 472 U.S. at 455. Johnson's reference to a "memo to Sgt. Greene" that allegedly "goes against other material put into evidence at the hearing" on this issue is

Case 1:04-cv-05919-RJH-GWG Document 51 Filed 03/28/07 Page 41 of 48

confusing. Pl. Decl. ¶ 24. The exhibit he provides, see Ex. S of Pl. Decl. (reproduced in Pl. Notice of Cross Motion), is merely an Inter-Departmental Communication that C.O. Fraser sent to Sergeant Miller detailing the fruits of various searches on April 9, 2002, see Inter-Departmental Communication, and thus does not contradict C.O. Fraser's testimony.

As to the alleged flaws in the testing process, the record indicates that the substance "tested positive for marijuana." See Report. In addition, C.O. Kelly testified that she was a "certified drug tester" and that all the contraband seized on the date in question tested "positive for marijuana." (Kelly: Tr. 29-30). To the extent Johnson believed that there was some flaw in the test used to determine that the item found was actually marijuana, it was Johnson's "obligation . . . to have contested the drug results and to bring any problems in the procedure to the attention of" the hearing officer. Rivera, 232 F. Supp. 2d at 124. Because there is nothing in the record to rebut the claim that the substance was in fact marijuana, Johnson's claim on this point fails.

3. Partiality of Hearing Officer

As previously noted, "[a]n inmate subject to a disciplinary hearing is entitled to, inter alia, an impartial hearing officer." Patterson v. Coughlin, 905 F.2d 564, 569 (2d Cir. 1990); see also Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard"). In the context of prison disciplinary proceedings, "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally. Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to

violate due process." Francis, 891 F.2d at 46 (citing Cleavinger v. Saxner, 474 U.S. 193, 203-04 (1985)). The "mere assertion that [the hearing officer] was less than a perfectly neutral arbiter, and that [the inmate] was thus denied a fair chance to prevail at the disciplinary hearing" will not suffice to constitute the deprivation of due process. Id. at 46. Likewise, a "plaintiff-inmate armed with nothing more than conclusory allegations of bias and prejudgment should not be able to defeat a well-supported motion for summary judgment." Id. at 47.

a. The Disciplinary Hearing.

Johnson argues that Richards was biased. While Johnson cites numerous instances of alleged bias, Pl. Mem. at 44-50, most of them amount to an attack on the merits of the decision. In other words, Johnson's view is that the mere fact that Richards found against him – in the face of a lack of strong evidence – by itself shows that Richards was not impartial. Johnson also points to instances in which Richards questioned officers to elicit testimony that was harmful to Johnson's case. See, e.g., id. at 44. But these instances – to the extent they are even supported by reference to the record – reflect instead Richards' appropriate attempt to make a complete record. Notably, Richards continually asked the questions suggested by Johnson himself of the witnesses. Johnson's remaining claims of bias are either too vague to support Johnson's claim of a due process violation or are unsupported by any evidentiary citation.

b. The Appellate Process

Johnson also asserts that the defendants charged with review of the disciplinary hearing were biased. See Pl. Mem. at 51-64. His arguments on this point are difficult to follow but once again seem centered on his contention that bias is demonstrated because of their failure to reverse the decision of the disciplinary hearing, despite "abundant evidence from which to

conclude that Defendants' [sic] Goord, Selsky and First Dep. Richards must have actually known of the due process violations complained of." Id. at 51. Again, the fact that officials did not grant his appeals docs not show they were not impartial.

C. Proposed Retaliation Claim

In his papers opposing defendants' motion for summary judgment, Johnson asserts for the first time asserts that "Fraser fabricated false disciplinary charges against him" because he apparently had not cooperated in an investigation regarding drugs. Pl. Mem. at 68. Apparently recognizing that his original complaint made no such claim, he makes a brief argument seeking leave to amend his complaint to add the retaliation charge. Id.

Johnson's request to amend the complaint is untimely. Putting aside the problem that plaintiff has not presented a proposed amended complaint that sets forth this claim, he has provided no explanation for asserting this claim more than two years after the case was transferred to this Court. Discovery has long since been completed and all that remains at this stage is the adjudication of the summary judgment motion. Defendants will be plainly prejudiced by being required to defend against a new claim when discovery has already concluded. See, e.g., Krumme v. WestPoint Stevens Inc., 143 F.3d 71, 88 (2d Cir. 1998) ("[A] proposed amendment . . . [is] especially prejudicial . . . [when] discovery had already been completed and [the non-movant] had already filed a motion for summary judgment.") (internal quotation marks and citation omitted), cert. denied, 525 U.S. 1041 (1998). Accordingly, Johnson's motion to amend should be denied. See, e.g., Cresswell v. Sullivan & Cromwell, 922 F.2d 60, 72 (2d Cir. 1990) (affirming denial of leave to amend complaint where plaintiffs offered no satisfactory explanation for making their motion until over one month after discovery had

concluded and after defendant had moved for summary judgment), cert. denied, 505 U.S. 1222 (1992); Messier v. Southbury Training Sch., 1999 WL 20907, at *4 (D. Conn. Jan. 5, 1999) ("The classic situation where courts deny leave to amend arises when a party files a Rule 15(a) motion after discovery has been completed or the nonmoving party has filed for summary judgment.") (emphasis in original) (citing cases); see also Juncewicz v. Patton, 2002 WL 31654957, at *6 (W.D.N.Y. Oct. 8, 2002) ("[D]enial of leave to amend is especially appropriate 'where it appears that a [party's] purpose in asserting a new claim is [his] anticipation of an adverse ruling on the original claims.'") (quoting Bymoen v. Herzog, Heine, Geduld, Inc., 1991 WL 95387, at *1 (S.D.N.Y. May 28, 1991)), appeal dismissed on other grounds, Olmin v. Patton, 63 Fed. Appx. 44 (2d Cir. 2003).

D. Request for Further Discovery

Johnson also briefly argues in support of a stay of the summary judgment motion pursuant to Rule 56(f), which provides a mechanism whereby a party may avoid summary judgment if the party can make a showing that it is entitled to a continuance to permit further discovery. Under Fed. R. Civ. P. 56(f), "a party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999) (internal quotation marks and citations omitted) (alteration in original).

Johnson does not begin to meet these requirements. While his notice of motion states that he seeks "Audio/Visual depositions of Third Parties," see Pl. Notice of Cross Motion at 1, his motion papers, with one exception, provide no explanation of what discovery he seeks or for what purpose. During the course of discovery, plaintiff had sought depositions of the defendants – but apparently only to obtain information regarding the underlying infraction. See Memorandum Endorsement, filed October 17, 2005 (Docket #21). The Court disallowed such discovery because Johnson's claim of a due process violation was to be determined based on the record produced at the disciplinary hearing. Thus, discovery of matters outside the record regarding the infraction could not be relevant to whether Johnson's due process rights had been violated. See id.

The only instance in which Johnson explains what discovery he seeks is his assertion that he needs "policy procedures; practices or job functions" to counter a statement by defendant Selsky, see Selsky Decl. ¶ 14, that defendant Goord did not participate in the review of Johnson's appeal. Plaintiff's Rule 56(f) Opposition To Defendant' Motion for Summary Judgment (reproduced in Pl. Notice of Cross Motion), at 31. Because Selsky's statement is not relevant to any issue in this case, Rule 56(f) does not provide a basis for staying this action to allow Johnson to obtain this discovery. Moreover, Rule 56(f) "applies to summary judgment motions made before discovery is concluded." McAllister v. New York City Police Dep't, 49 F. Supp. 2d 688, 696 n. 5 (S.D.N.Y. 1999) (emphasis added) (citations omitted); accord Chimarev v. TD Waterhouse Investor Servs., Inc., 280 F. Supp. 2d 208, 229 n. 1 (S.D.N.Y. 2003); McNerney v. Archer Daniels Midland Co., 164 F.R.D. 584, 588 (W.D.N.Y. 1995) ("Applications to extend the discovery deadline must be made prior to expiration of the deadline

. . . Rule 56(f) is not intended to circumvent discovery orders."). Here, Johnson had the opportunity to request these written materials (and to seek Court intervention if they were not provided). Notably, he was given several extensions of the discovery period and propounded at least three sets of interrogatories. Memorandum Endorsement, filed October 17, 2005 (referring to plaintiff's "third set of interrogatories"). Thus, there is no basis for granting a continuance for Johnson to conduct discovery.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be granted.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Richard J. Holwell at 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Holwell. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140, 144-45 (1985).

DATED: New York, New York
October 19, 2006

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Mr. John Johnson
95-A-4645
Eastern Correctional Facility
P.O. Box 338
Napanoch, N.Y. 12458

John M. Schwartz
Assistant Attorney General
120 Broadway – 24th Floor
New York, NY 10271

Hon. Richard J. Holwell
United States District Judge

. . . Rule 56(f) is not intended to circumvent discovery orders."). Here, Johnson had the opportunity to request these written materials (and to seek Court intervention if they were not provided). Notably, he was given several extensions of the discovery period and propounded at least three sets of interrogatories. Memorandum Endorsement, filed October 17, 2005 (referring to plaintiff's "third set of interrogatories"). Thus, there is no basis for granting a continuance for Johnson to conduct discovery.

CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment should be granted.

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Richard J. Holwell at 500 Pearl Street, New York, New York 10007, and to the undersigned at the same address. Any request for an extension of time to file objections must be directed to Judge Holwell. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140, 144-45 (1985).

DATED: New York, New York
October 19, 2006

GABRIEL W. GORENSTEIN
United States Magistrate Judge